The next case is Consumers' Research v. Federal Communications Commission. Trent McOtter is here for the petitioners. Adam Cruz is here for the respondent, FCC, and it looks like you're ready, Mr. McOtter. Thank you, Adam. Thanks, Judge, and may it please the Court. In a non-delegation challenge, what suffices as an intelligible principle will turn on the nature and scope of power delegated. Here, Congress delegated to the FCC the power to decide how many billions of dollars it would raise for a nationwide social program. But we know from cases like NCTA in 1974 from the Supreme Court and Skinner in J.W. Hampton that when it comes to raising revenue, there's a requirement for some kind of objective limitation to satisfy that intelligible principle test, like caps, rates, formulas, that sort of thing. We also know from NCTA that statutory language like public policy raises grave non-delegation concerns. However, the Universal Service Fund statute contains no such express limitations or rates or formulas. What about all the intelligible principles articulated in subsection B of the statute? What's wrong with those principles? So, there are several issues with those, Your Honor. First and foremost, FCC itself has stated that they are aspirational only. They're all stated as things that FCC, they're all stated as shoulds, things that should be considered, things that should, that FCC should try to affect. Even if you run through several of them specifically, Your Honor, for example, the just, reasonable, affordable language. Well, the Supreme Court says it's a pretty lenient standard. We recognize that the intelligible principle test is lenient, Your Honor. But again, the NCTA case, Skinner, J.W. Hampton, those all involved revenue raising. Those are the only cases that involved revenue raising. We don't think it's a coincidence that the two times the Supreme Court has upheld revenue raising, that there was some kind of objective limitation. And that's not just a distinction that we're making after the fact. Which cases are those again? Skinner, J.W. Hampton, and then the third one, which I cited earlier, is NCTA, National Cable Television from 1974. And that court, that decision drew the same distinction. Look, when it comes to raising revenue, we have to be very careful here because if we allow agencies to raise money just based on vague things, vague standards, like in the public policy, then that sets an agency on the course to, on a course to try to raise funds just like the Appropriations Committee of the House of Representatives. Is it possible that some combination of the words sufficient and one of the should, you know, what is it, specific, predictable, insufficient, or something, and then the affordability criterion, is it possible that those two somehow sort of merge into something that might plausibly be called a formula? I would not say so here for a couple reasons, Your Honor. First, they are still phrased as shoulds, and the Supreme Court said in Whitman that if it comes to the agency's discretion of whether to do something or not, then that's irrelevant for non-delegation purposes. We can't trust an agency to, that it should do the right thing. Congress doesn't say that the agency shall do something. Second, on sufficiency in particular, sufficiency, I would say at most, sets a floor, and there's case law on this that we cite in our briefs from D.C. Circuit, from the Fifth Circuit, saying that the FCC can raise more money than is necessary. They don't have to just equal that exact amount, and I think that's a key distinction between this case and Whitman. There are several, but that's a key. One is the court interpreted requisite there to mean both a floor and a ceiling, whereas here, even if you interpreted the should as a shall in Section 254B, the FCC can still over-raise, and there's cases saying that. So can I ask you this? Obviously, you've made sort of first principles arguments in your briefs, recognizing that the Supreme Court precedent, at least as it currently stands, as Judge Wilson says, pretty lenient. I mean, it may be that to the extent your non-delegation, what I'll call your normal non-delegation argument fails, it's only because non-delegation doctrine has become sort of punchline or something. But so in your kind of like first principles fantasy world, sort of the originalist sort of, you know, sort of coming at this from on a blank slate, what is permissible? Like what sort of agency participation is permissible? So I think I would cite Justice Gorsuch's dissent in Gundy, where the Supreme Court, or I should say his view that the Supreme Court should say that an agency could undertake particular fact-finding to fill in the gaps. So perhaps Congress could say, as it did in J.W. Hampton, I think, and I think J.W. Hampton, as Justice Gorsuch recognized, would probably satisfy original non-delegation principles. Congress can say, we want the executive, we want the FCC to calculate the difference between this particular price and this other particular price. And also, remember the statute in J.W. Hampton had a cap. So that's the best authority that you can cite in support of your position as a dissent? Oh, for the original understanding, I would say yes. Just because we acknowledge the Supreme Court has not adopted that original understanding currently. But in response to... So I'm not aware of any authority after the 1930s that strikes down a delegation of agency authority for violating the non-delegation doctrine. There are more recent lower court decisions. For example, the Fifth Circuit and the... I think it's the benevolent, National Horsemen's Benevolent and Protective Association is a non-delegation. That's more of a private non-delegation challenge, which we also raise here. And I'm happy to address that one as well. Would you mind, speaking for myself, sort of pivoting before your time runs out to talk about that? Speaking, again, only for myself, I think that challenge has legs, more legs than perhaps your normal non-delegation argument was. So talk about that. Let me ask you this just to get you going. So there is something that feels sort of instinctively weirder or worse about legislative power being sort of delegated all the way outside the government from Congress to agency, from agency to a private party. Is that... What's like the textual anchor for that intuition? Is that an Article 1 problem that some private entity is purporting to exercise legislative power? Is an Article 2 problem that the agency, having been delegated something, has now given it away? Is it due process? Is it something else? Like what is sort of the textual anchor for your private non-delegation challenge? So I would say Article 1, Section 1, the legislative power is vested in Congress alone. So there's that issue. If the agency then re-delegates what is effectively legislative power, or in this case, it's more of the agency refusing or declining to review the private carrying out of particular actions, Article 1, Section 1 violation. I think you're right. It could also be framed as an Article 2 violation that the executive, the president is vested with the executive power. Private parties are not vested with executive power. So even if you say that USAC, the private company here, is not necessarily exercising legislative power in its purest form, like issuing regulations, but is in a sense executing the law, executing that legislative power that's been given to the FCC, that would be an Article 2 violation. I think there's also concerns about Article 2 take care clause, for example, which I think goes along with the vesting clause, that these are powers given to the president for accountability purposes. Can I ask you a quick question? I've read the statute, and I'll ask your adversary as well. Does the statute itself ever refer to the USAC or its predecessor? Is there any indication that Congress even knew this thing would exist? There is not. No. These companies were created after the statute was passed. So again, that makes it weirder to me in my mind. Does that make it worse from a constitutional perspective, and if so, how? So I think it's unconstitutionally the way, Your Honor, obviously, but I think in a way it does make it worse because there's no evidence that Congress itself wanted a private party to be executing these. There are some cases that draw a distinction there, saying there's no evidence that Congress was okay with this. I think if you look at Judge Ho's dissent from the denial on Bonk and Rettig, he points and makes that distinction. But I think in a way it doesn't really matter because even if Congress specifically said we want this private party to carry out legislative functions or we want a private party to be executing the law, that would still violate Article I and Section 2. So let me ask a variation of the same question I asked you about your normal non-delegation challenge. What role, if any, can private parties play in the formulation of government policy, I'll just say? It seems like I think reading the dissent in the Fifth Circuit case, those judges would have said none, zero, like no involvement. Does your position necessarily go that far or is there some aspect of what USAC did here or some hypothetical private company sort of kibitzing with an agency that would be permissible in your view? I would say probably most reasonably that a private party could carry out truly ministerial tasks. And I know FCC claims that's what USAC does. It's our view that that's certainly not what they do. But for example, FCC could determine, assuming that FCC has this power, FCC determines the rate and says for each company, here's what you're going to pay. We don't have a bunch of copy machines and printers. We need to hire a private company to mail out these bills and to get the money back and process the paperwork and that sort of thing. Ministerial tasks like that I think would be fine because I'm not sure that that's labeled as a legislative or an executive function. For instance, when the D.C. Circuit in, the case name now escapes me and I'm sure it's something telecom because most D.C. Circuit cases are. But when it says something like there are kind of like three ways that this might be permissible. You might allow the private company to engage in like ordinary fact finding or certification sort of condition to agency action or advice or any of those three. Maybe the fact finding is the piece that you're sort of saying might be permissible. Any of the rest? I think you're probably thinking of the Amtrak case, whatever Amtrak's legal name is, is the D.C. Circuit case. I would say fact finding is probably not permissible by a private party. I think kind of ministerial carrying out of actions already taken by the FCC pursuant to Article 1 and statutory power would be fine. I think things beyond that, if we're under the original understanding, probably not allowed because it's unclear what role USAC has under the Constitution. They're not Article 1. They're not Article 2. So, for instance, like in the case that generated the dissent on the Fifth Circuit, where I think they were looking for some actuarial kind of sign off or some group of actuaries, let's make sure they've signed off on this thing before the agency blesses it. That, no. I mean, frankly, I'm not sure you have to go that far in this case. I'm not really sure that this case implicates that. But from your perspective, is that a no-no as well? I would certainly hesitate to disagree with Judge Jose's dissent on that case. I agree that we don't have to go that far here because I think USAC's role is far beyond just kind of checking someone's math. USAC sets the number each quarter. The FCC commissioners don't even bother to approve it. It gets approved automatically. And one other case, if I could, Your Honor, just on the role of private parties. What do you mean it's approved automatically? Everything the company does has to be approved by the FCC, doesn't it? It's approved by default, Your Honor. The USAC sets the quarterly contribution. So the USAC determines how much money they think is needed each quarter for universal service. The FCC Office of Managing Director then ministerially calculates that into a taxing rate based on expected revenues coming up. And then if the commissioners themselves do nothing over 14 days, it just happens. The USAC's rate becomes the binding rate that applies to millions of people across the country. We're in action because the commissioners did nothing. Right. And based on 25 years, the commissioners have almost never done anything. I have struggled to find any other statute where a private party's actions. They can. They do have the authority, though, to reject the proposal by the company. They do have the authority, Your Honor. In the case I was going to cite, the last case, Judge Newsom, was this court's decision from the Sierra Club. It's from the 70s. It's the old Fifth, but it's still binding on this court where the Fifth Circuit said that the agency still must actually review and independently confirm what the private party is recommending. And so even if we say USAC's just making a recommendation, there needs to be some kind of evidence that the FCC is reviewing it substantively. And here we have the exact opposite. It happens by default. It's kind of the opposite of any kind of independent review. There's nothing in the record that would suggest that they do that, especially for this particular order that we challenge here. So your argument is there's oversight, but the oversight is insufficient? I would say there's theoretical oversight under the regulation, Your Honor, and nothing else. Thank you. Thank you, Mr. McArthur. Mr. Cruz. Good morning, Your Honors. I'm Adam Cruz for the Commission in the United States. The Fifth and Sixth Circuits were exactly right when they rejected the petitioner's comparable non-delegation challenges. The reason being that those courts recognized that in Section 254, Congress itself created the obligation on carriers to pay into the Universal Service Fund, identified that they would be paying for the Universal Service Fund, and provided in the Fifth Circuit's word, a statute replete with intellectual principles to guide how the Commission would be implementing Congress's chosen policies. You do acknowledge at some level, like I recognize that I think, frankly, you've got the tailwind of Supreme Court precedent on your side with respect to the normal non-delegation challenge. But you do, I mean, surely even you, when you read the statute, it just feels like a lot of words, like a lot of, there's a lot of like sort of soaring kind of rhetoric in the should clauses, but it's not very precise. I agree that there are a lot of words where I think I would part ways respectfully, Your Honor, is what those words mean and how they actually constrain us. I'm happy to point to a number of situations where I think, to a number of textual hooks that I think set the outer bounds of our discretion. It is true the FCC has a fair amount of discretion in implementing this statute, but as the Gundy decision makes clear, discretion, even broad discretion, isn't unconstitutional. So we agree there does need to be an outer limit, and I want to point to a couple of provisions in particular that I think establish that. So the first is, if I can direct your attention to subsection 254D, there are two important limiting pieces of language in there. The first is, you know, what can we collect this money for? And it says that the collections and the contributions have to be used to preserve and advance universal service. So as a first cut, this is not a backdoor to general revenue raising. We are limited to a very specific purpose. Well, in fairness, right in C, the statute says that universal service can be defined essentially however the commission wants to. I would disagree with that, Your Honor. The universal service is still constrained in a number of ways in subsection C. So to point to the constraining language there, first, universal service relates to telecommunications services. That's a defined term under the act. So there's a limited universe of things that can be included. Second, you know, when we go through the process of defining universal service, we are specifically directed to take into account certain facts about the world. You know, those are advances in the telecommunications and information services. And then the second sentence of C goes on. It tells us specifically what we need to think about, and those are objective factors. For example, we have to look at the extent of deployment out in the country. We have to look at consumer behavior and the extent to which end consumers are, you know, a substantial majority of them are subscribed to particular services. So even under the petitioner's view that there needs to be some back funding, that is embedded in subsection C. So there are limits on what we can actually go after and fund. And how we raise the revenue is, again, constrained when you start working your way down from C. So to pivot back to subsection 254D, another important piece of constraining language is that requirement that the contributions be equitable and non-discriminatory. The Fifth Circuit, in one of the early cases, topic one that we describe it, that we discussed at page 45 of our brief, they had no difficulty looking at that equitable requirement and saying, one thing that means is that the commission can't force people to basically incur a loss to participate in universal service in the telecommunications market. One of the issue in that case was there were some carriers that might have been required to pay more into the fund than they were getting from interstate telecommunications. And the Fifth Circuit said, well, that's just incompatible with the statute. So we think clearly that's an intelligible limit because the Fifth Circuit had no problem applying it against us. Let me ask you this, because I think it may be that the second thing that you talk about in D is the next clause, which is about specific, predictable, and sufficient, which goes to the question that I was asking Mr. McConner. What in response to his contention that in sort of revenue raising land, you need something that looks like a formula. I don't mean to put words in his mouth, but some quantitative sort of outer limit. And that sufficient doesn't really do it because all that sufficient does is tells you the basement. So let me approach that with two answers. So first, let me tackle the word sufficient on its own. I think it's important to keep in mind the Supreme Court's repeated reminder that statutory interpretation isn't about plucking isolated words and phrases out of context. Statutory interpretation is the process of interpreting statutes, and that requires looking at full context. So in the context of 254, sufficient is not just a floor. It's also an upper limit. For reasons Your Honor was talking about earlier, about how this has to be read in all about affordability. And affordability being baked into what universal service is going all the way back to 1934. Three courts of appeals now have looked at this statute and said, in the context of universal service, sufficient is also a soft cap. That's the word the Sixth Circuit used in their opinion, rejecting the petitioner's challenge. The reason is, if we let the collections get too excessive, what's going to happen is people are going to get priced out of the market. And if people are priced out of telecom market, we are not advancing universal service. And that's going to be an objective fact in the world that people can point out, that can be judicially reviewable, that folks are going to be able to bring against the commission. So do you, I guess, deny the premise of the question or of Mr. McCotter's argument that in revenue raising land, see the three cases he cited, Skinner, Hampton, NCAT, whatever it was, that you might need some sort of quantitative outer limit? That's exactly right, Your Honor. We completely disagree with that premise. And I'd like to talk about those three cases in particular. So with Skinner and, as to Skinner and J.W. Hampton, again, I think the Sixth Circuit very ably addressed that argument in their opinion, especially the published pages at 788 to 790. As they explain, the petitioner's theory is really trying to build a constitutional rule out of facts that will just happenstance. The short answer is, as the Sixth Circuit explains, what the petitioners are trying to say the rule is in this context is built on facts that were floating around to which the Supreme Court described no materiality whatsoever. And as for the NCTA case, I also think the petitioners are overreading that. And that's not just me. That's the Supreme Court's thoughts. I think Skinner in particular, in the very last paragraph of the Skinner opinion, the Supreme Court unanimously said what NCTA stands for. And their language is, NCTA stands for the proposition, stands only for the proposition, and only is the Supreme Court's word, only for the proposition that if Congress wants to authorize the executive to collect funds from regulated parties, where those funds will, you know, reimburse for costs that injure the public generally, Congress needs to speak clearly. It's kind of just a clear statement principle. And Skinner brushed aside any attempt to sort of read in what the answer to the avoided constitutional question might have been. So if we take Skinner at his words about what NCTA says, we have to ask ourselves, does Section 254 speak clearly enough? Well, as I said earlier, in Section 254, Congress identified who has to pay the interstate carriers. It identified what they have to pay for, the universal support mechanisms, and it identified how the FCC is supposed to go about collecting that money equitably and nondiscriminatorily. So that is, we think, a very clear statement of the liability-creating obligation coming directly from Congress, not from the executive branch. And that's why it's for executive power. Would you mind, at the risk, I don't mean to pivot off the normal non-delegation challenge to the private delegation challenge, but would you mind talking to me a little bit about that? Do you agree that the statute doesn't reference USAC? I agree it doesn't reference USAC, but let me push back a little bit on the suggestion that there's no textual hook. As we explain at page 11 of our brief, before the 1996 Act was enacted, USAC is a subsidiary. of a pre-existing organization, the National Exchange Carriers Association. NECA was the administrator of various universal service programs before the 1996 Act. That included, for example, our Lifeline program, which is what supports low-income consumers. So if you look at subsection 254J, one of the things that Congress wrote into the statute was that, and I want to make sure I'm not misrepresenting the language here, so let me put it myself, nothing in this section shall affect the collection, distribution, or administration of the Lifeline Assistance Program. And then Congress went on to point at our specific rules that were governing Lifeline. So I think one way to read 254J is Congress was aware of the background fact that NECA was the appointed administrator of our Lifeline programs, and Congress said in 254J, don't read anything in the statute to disrupt, to necessarily require you to disrupt the way these programs are being administered. So, you know, 254J is, again, to briefly tie this back to the regular non-delegation argument, 254J is about as implausible a principle, I think, as you can get, because Congress pointed at a pre-existing program of ours and essentially said, keep doing this. And in doing that, I think it's fully... But doesn't that sort of cut against you also? Because if they specifically mention a particular program, why wouldn't they mention a private entity? Well, you know, again, they would have understood, we think, that NECA was the appointed administrator. And I don't think they would have wanted to set... You know, one possibility for not identifying NECA in particular is because it may be possible that we would want the administration of the program to change over time, which we did. You know, we required NECA after the 96 Act to create USAC, and then we appointed USAC ultimately to be the current administrator of the program. So I think Congress wanted to retain that level of flexibility with us. But I also think it wouldn't have come as a surprise to Congress at all that a private entity was going to be involved in administration. So to keep on the private... I guess the reason that I worry about this a little bit is like, for instance, in Carter Cole, the Supreme Court refers to an explicit delegation by Congress outside the government as obnoxious, right? And this does seem like more obnoxious in the sense that Congress... There's no real, really good indication that Congress even knew that USAC would exist. Maybe this lifeline thing, which frankly, I'm glad you pointed it out to me. I hadn't really focused on Jay. But if that's sort of the best indication we've got that Congress envisioned this delegation outside the government, that's certainly weaker than what was going on in Carter Cole, right? Well, let me push back on the idea that it's a delegation outside the government, Your Honor, because of course, our view is that no government power has actually been handed off to USAC. One of the basic features of the Communications Act, going back to 34, even on top of all the stuff that was added in the 96 Act, is the commission has been granted a lot of authority to structure and administer its own programs in accord with the public interest. So this level of flexibility, I think, is fully consistent with what Congress has been allowing the FCC to do for decades. And this idea that we might rely on a private outside party to assist us is not something that I think Congress wanted to preclude. I don't think it raises to a constitutional level, to go back to my prior point, because USAC does not have any actual government power. As I think the Fifth and Sixth Circuits rightly acknowledge. It does have some government power because it sets a rate, correct? I would disagree with that, Your Honor, because USAC does not set the rate. They collect the information that they then hand over to our Office of Managing Director. And the public notice that announces what the rate is going to be, that calculation is done in-house at the FCC by us. So there is intervening agency action in the agency and our Office of Managing Director, both doing the front level screen when USAC is handing the information to us 60 and 30 days in advance, and also when we then run the numbers to announce what the contribution factor will be. And in that respect, I do want to point out, just last week, actually, we published our actually tweaked some of USAC's numbers. There was some leftover money for rural health care funding. So this would be the third time in history, right? Well, this would be, I think, the third time that we've had to adjust it on the back end. We also cite in our brief, of course, some of the reason that we don't have to intervene is there are times when peculiar situations come up that we account for on the front end. And there have been times that the commission has said, in calculating the data for this particular quarter, do the following. And then if USAC does it, we have no need to intervene on the back end. But for an upcoming quarter, I guess, we found some rolled over money that we tapped into to say, we can use this to offset what we would otherwise need to collect to satisfy the demand projections. So as a result, we're still in the 14-day approval period. We know some things can change. But it looks like- So let me ask this. So the record does reflect that in the past, the FCC has rejected a contribution factor? We have made slight adjustments to the contribution factor on the back end. We discussed that in our brief. Some of that has been for policy adjustments. For example, the commission decided that we would round certain percentages, and that's resulted in a change. But on balance, the reason that the commission is not often intervening in these cases, it's because what USAC is doing is so routine. I would emphasize that for constitutional purposes, what we need to be focusing on is the way the system is set up and what USAC can do under the rules. And they are very constrained to serving mostly billing, accounting, distribution, collection functions, very ministerial acts. It shouldn't be surprising that the FCC isn't intervening because what they're doing doesn't entail really any policy discretion. So just help me because I really do want and need to understand this. On the front end, are you saying that all USAC does is gather information and hand it to FCC, and then the FCC's math geniuses do all this work by themselves? USAC does not calculate any rates, presumptive or otherwise. The contribution factor is calculated in-house. When USAC is trying to figure out the demand projections, there may be certain math they have to account for. We explained in our brief, for example, we impose caps on some of these programs. So when USAC is trying to figure out, well, how much money could possibly be at stake in such and such quarter, they're, of course, bound by formulas that we wrote into our rules. So there is math attempting at USAC. I would just suggest that what they were doing is applying the math that we gave them. The contribution factor, which is at issue here, however, Your Honor, is done in-house. And it's a fairly simple formula that takes information data collected from USAC, and just sort of hand it over to us in advance of the contribution factor. It sounds like USAC does other things than just collect information. They also are responsible. They have other functions. They send out the invoices. They do collect the money. They're in charge of overseeing the disbursements. So there are a lot of ministerial things that make the program work. But what's important is, and we built this into our rules. They do the disbursements? They do oversee obligating the money and taking in the applications for people who get funding requests. Of course, the money itself is maintained at the US Treasury and is sort of drawn from there in accord with when obligations are agreed to. Do they make the determination of who gets funding? USAC makes the first cut on who's eligible for funding, but that is subject to our rules. So we have eligibility rules about what sorts of telecom carriers can get funding or what it takes to qualify. USAC makes a first cut decision. If there are hard policy questions involved in that, they're supposed to escalate those to us automatically. Sometimes they will make a decision, but oftentimes, I wouldn't say sometimes, a lot of times USAC makes these cuts about who's eligible or what they're eligible for. And there is an appeals process where you can get de novo review at the commission. Has that happened? I know we were talking about on the contribution rate thing. You had done it twice before this litigation, now once more. How about on the disbursement side? Have you guys ever ex post kind of vetoed a disbursement decision made by USAC? I want to be very careful about how I'm saying the disbursement decision. So for example, we do very routinely overrule decisions about who is eligible to receive money. In fact, we cite an example of that in our brief. I apologize that I don't have the exact page at hand, but the typical process is essentially a lot of these appeals to the Bureau roll in over the course of a quarter, and we sort of collect them all together. And then we do a big order where we grant, dismiss, and deny in sort of big sweeps. But again, these are reviews after the first cut. So it's almost like second tier review. It is the case that people who are aggrieved by a USAC decision have to file with the Bureau or you appeal to the agency. That seems strange because you're asking for taxpayer money from a private company. Well, the decision, the USAC decision, it doesn't necessarily become final until, you know, the administrative process is not final until the commission has spoken if someone files a timely challenge. But that costs money. So you're having to make a request and it goes to USAC. And if they deny it, some people may move on because they don't have the resources to now do this second tier review to the actual FCC. Well, I guess I would say I don't, I like to believe that our process is pretty painless in terms of getting the appeal filed with the Bureau. But to bring this back to the constitutional question, the touchstone in all of the case law on this is that there isn't a violation as long as the agency has the final decision, has the final decision. I think there are lots of situations in government, Your Honor, where someone might not pursue every avenue of relief that is available to them. But as a structural constitutional matter, what is the dispositive factor here is that the FCC always retains final control over all of these decisions and that that avenue of relief is available to everyone who might consider themselves aggrieved by a USAC decision. Is that true, sort of the flip side of the question I asked Mr. McConner, is that true no matter how sort of hypothetical, theoretical or infrequent agency involvement is? Because I think you would have to admit, I think, maybe not, but it seems that the FCC's like active involvement in calculation and disbursement here is relatively infrequent. Like the sort of the grist of this stuff is getting done at USAC and you guys are, I'm not going to say rubber stamping, but you're not vetoing and allowing things to happen. I sort of understand how this works because I spent six years on the Federal Rules Advisory Committee for appellate rules. I was a private lawyer. And those things bubble up through the judicial conference, the Supreme Court. And then if Congress doesn't veto them, they become the rules. And so I kind of get how this veto procedure works. But is that, I mean, like to what extent does the agency need to be actively involved, like in the, to use the term that we used in Sierra? Well, so I, one area where I want to emphasize where the FCC is actively involved is of course, USAC is carrying out our rules and our instructions. So, you know, a lot of agency work is on the front end of designing these programs, designing eligibility criteria, designing the formulas for who's going to be eligible for payments. And then USAC can kind of just go. Now there are always going to be different, you know, there are going to be cuts that have to be made. And some of those are going to be policy cuts. The rules express the account for that by saying, USAC, you really need in the first instance to be sending those to the FCC. And if for any reason that doesn't happen, and there's a difficult policy decision, we give folks who are aggrieved the chance to come to us via this appeal process. So, you know, in terms of active involvement. Just so I understand the appeal process on the disbursement side, is that on a different timeline than the 14 day timeline that applies to calculation? So the rules start running your clock to bring your challenge to the Bureau based on when USAC makes the particular decision that's relevant to you. So the contribution factor system sort of runs on its own track. And there are lots of other decisions, the day-to-day administration that are happening that sort of trigger their own timelines. There's a lot of moving pieces here in terms of when applications are due, when they get acted on. And there's sort of a constant ebb and flow of folks who are going to USAC and then, you know, some of those folks then elevating issues to the FCC. But it is, you know, a year round process of our supervising USAC and making sure that they're adhering to our rules. And sometimes, you know, going in and overruling decisions they made and explaining to them, you actually got this wrong. At which point, you know, USAC's then bound by that commission precedent as well going forward. So this idea of no active oversight, I think, isn't accurate because there's sort of a body of administrative common law almost where we have made rulings over time to which USAC conforms. And so, you know, in that sense, they're subject to our oversight and review. But also, you know, I want to push, I want to just caution very strongly against trying to draw inferences from our failure, from, you know, any sort of absence of overruling contribution factor decisions. Because as I think the Sixth Circuit summarizes very well in their opinion when they said, the decision not to act is itself a policymaking decision. So what you really have to look to for constitutional purposes is how are the rules set up? What can USAC do? And the key thing I want to emphasize is the decision about how much money people owe that is driven by the contribution factor, which is approved and that which is always approved and reserved to the FCC, to government action. All right. I think we have your argument, counsel. Thank you. Thank you, Your Honor. Mr. McCotter, you've reserved some time for rebuttal. Thank you, Judge. I'd like to pick up on this series of questions about USAC. The FCC makes it sound like each quarter there is one true platonic universal service rate and it's USAC's job to determine that, like measuring how many electrons are in a chemical or an element or USAC must exercise judgment when it decides how much money is needed for universal service, if only because the statutory definition of universal service is so vague, which is why the number bounces around each quarter. It can swing somewhat wildly. It's still reviewable by the agency, though, still. It is reviewable, Your Honor. As I was saying, this court's decision in Sierra Club states that the agency must actually review it, though. And on that line of inquiry, I think the mere fact that the commission itself rarely modifies USAC's numbers is not dispositive in itself. Maybe that's an indication that USAC's doing a good job. I think it's an indication that the FCC commissioners have decided that they don't want responsibility for this program. The most substantive change they've ever made. Well, isn't that just speculation on your part? I don't think so, because the evidence here is that the commissioners set up a process where USAC's proposal becomes binding by default if the commissioners don't act. And that, I think, is really the unique aspect here. I'm not aware of other statutes that set up a program like that. And so, because of that . . . It's a quick question so I understand the sort of process. It sounds like there is USAC involvement both with respect to calculating the contribution factor on the front end, I'll call it the front end, and then disbursements on the back end. Your adversary has described sort of a rolling appeals process for disbursements. Do you dispute any of that? It sounds like the FCC might be more involved with respect to fact-checking disbursements than they are on the front end with respect to contributions, but I just don't want to be mixed up. I think that's true, but I also think it's largely irrelevant because the back-end review process parties under . . . This is the CFR site, 54.709. They challenge USAC determinations. They're challenging, as I understand it, USAC's calculation of how much revenue a particular company had, and therefore, when you multiply that times the contribution rate, how much money that company should have contributed to the fund. That's not really a mechanism for challenging quarterly rate in the first place. I'm not aware . . . You're just saying, basically, I don't really care about that. Right. The disbursement process is not a meaningful opportunity for the Commission to exercise oversight over the contribution rate itself. That's your . . . The focus of your challenge . . . This is helpful. The focus of your challenge is on the calculation of the contribution rate in the first place. Correct, and I don't believe the back-end disbursement process is even . . . Not just that parties don't use it, but I don't even think it's designed for people to challenge the contribution factor. I mean, I kind of suspect the FCC would argue any challenge at that point would be too late. They should have challenged it when the Commission kind of silently approved. Fifth Circuit said, for example, that the FCC allows the telecommunications carriers to challenge the company proposals to the FCC, and quote, and often grants relief, close quote. Is that accurate? I'm not sure how often it is, Your Honor, but again, I do think that's referring to company-specific facts, how much revenue did a particular company have, such that when it's multiplied times the company's total amount they would pay into the funds is X versus 99% of X. That's what that process is used for, Your Honor. It's not used for the front-end contribution rate determination in the first place. And so, will you just . . . And I don't want to ask you to repeat something you've already said, but maybe it just takes it a few times to get it through my head. So, will you then just talk about your perspective of how the calculation of the contribution rate operates on the front-end? Because it just feels like we're two very different stories. You're saying USAC is doing all the hard work. Your adversary is saying the FCC is doing all the hard work. We tell them what to do. They crunch some numbers, give it to us, and then we really sort of lay the wood to the numbers and figure out what the rate is. We've heard now, I think, a sort of crisp presentation of the FCC's understanding of the process. Tell me yours. What happens on that front-end with respect to the calculation of USAC? So, USAC does have certain guidelines that the Commission itself has established for how they should determine what the amount should be for the next quarter for universal service. But within that, they have, in our view, a fair amount of discretion to decide how much money is actually needed for universal service. As I said, I think that's just a natural result of the fact that the statute, Section 254, is so ambiguous and vague and that sort of thing. USAC comes up with this number. Okay, we think for universal service for Q4 2022 that the amount of money needed for the whole country is $2.1 billion, and they have spreadsheets to show it as to how they got to that number. But they still have discretion in terms of how to get there. There's no one true universal service number. They then send that to the FCC, the Office of Managing Director, which is below the Commissioners, obviously, ministerially calculates that into a taxing rate based on what they think that quarter's revenues will be for interstate carriers. Sounds like that's what the disagreement is. You think USAC is doing the heavy lifting, and then the FCC underlings are doing ministerial work. The FCC thinks that you're doing ministerial work and that the FCC underlings are doing the real, sort of the hard math. That's probably a fair characterization. I think they might also say that the FCC, even if they're not doing hard work on the back end, the FCC set up rules on the front end, but we disagree that those rules actually allow what would be acceptable under current case law. And again, even if I think your honors disagree with all of that, there still needs to be at least some evidence, like some piece of paper or something that we could point to to show that the Commissioners on the back end actually do undertake that obligation. May I ask one more question, Judge Wilson? Yes. I just sort of want to understand this. Is your concern that when USAC is collecting the data, are they doing something? Do they have the discretion in what data they collect that they then give to the Office of Management? I'm not sure, to be honest, where they get all of their data from. I will point out that USAC, as a private company, is largely filled its board by members of the telecom industry, so they are, in a way, interested parties. I think that's just another reason to be skeptical of this program. It's not as if USAC is kind of an adjunct to the FCC itself, government officers who've taken a note to the Constitution and statutes and that sort of thing. But on your specific question, I'm not actually sure exactly where USAC gets its numbers from, which I would say is probably just another flaw here, which is why we say, kind of to wrap up this point earlier with Judge Newsom's question about what could a private party do, and I said they could do ministerial tasks. In our view, it's the FCC performing ministerial tasks for a private company, which is a private non-delegation violation. Thank you. I think we have your argument. Thank you. Court is in recess until